IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2023

# IN RE CHANCE B. ET AL.[1]

**Appeal from the Chancery Court for Montgomery County**
**No. MC-CH-CV-AD-20-14        Ben Dean, Chancellor**

_____

**No. M2023-00279-COA-R3-PT**

_____

Mother appeals the termination of her parental rights and the stepparent adoption of her two children by their stepmother. The trial court found three grounds for termination: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody. The trial court also concluded that terminating Mother's parental rights was in the children's best interest. The termination was conjoined with a stepparent adoption, which the trial court granted. The Mother appeals. We affirm the judgment of the trial court terminating Mother's parental rights and granting the stepparent adoption.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and CARMA DENNIS MCGEE, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Heather B.

James R. Potter, Clarksville, Tennessee, for the appellees, Jennie B. and Troy B.

## OPINION

Troy B. (Father) and Heather B. (Mother) are the biological parents of Chance B. and Isaiah B. (collectively, the Children). Following Father and Mother's divorce, Father married Jennie B. (Stepmother). Over the years, Father and Stepmother have filed several

---

[1] "In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *1 n.1 (Tenn. Ct. App. May 15, 2023).

parental termination and stepparent adoption petitions concerning the Children. Their previous attempts were unsuccessful. The Chancery Court for Montgomery County, however, granted Father and Stepmother's March 10, 2020 petition for termination of Mother's parental rights and adoption by Stepmother on February 3, 2023. The Children were seventeen and fifteen years old on the date of trial and at the issuance of the trial court's orders terminating parental rights and providing for adoption. Chance, however, turned eighteen before the parties completed briefing in this appeal. Mother appeals the Chancery Court's order terminating her rights and granting stepparent adoption.

Chance was born in Newport, Washington, in 2005 while the parents lived near Mother's extended family. Isaiah was born in Butte, Montana, in 2007 while the parents lived near Father's extended family. It appears that Mother and Father separated in 2009. Thereafter, the Children moved into a home in Clarksville, Tennessee, with Father and Stepmother by no later than November 2009. Neither party disputes that the Children have lived exclusively with Father and Stepmother since November 2009.

Prior to their 2011 divorce, Mother and Father jointly executed a permanent parenting plan in 2010. According to this document, Mother was unemployed at the time of execution and lacked any source of income. Father, meanwhile, indicated that he earned $1500 per month in gross income. The parents agreed to exempt Mother from any child support obligations on the basis that "Wife [is] unemployed. Caring for her mother in Washington (state)." The plan also addressed the Children's residential status and visitation. Regarding the former, the parents agreed to name Father primary residential parent, assigning him 365 days of residential time. Mother, meanwhile, obtained 116 days of residential time in the form of daytime visitation.[2] Specifically, the parents agreed that Stepmother would supervise all of Mother's interactions with the Children, which were to occur on Wednesday and Sunday afternoons at either the Moore Elementary School park or the Clarksville public library. The plan denied Mother overnight visitation, though she could overcome that prohibition by providing proof to Father and Stepmother that she passed a drug screen, completed mental health and psychological evaluations, and obtained housing "with furnishing" for the Children.

Mother and Father divorced in 2011. At approximately the same time, Father married Stepmother, and the two have parented the Children ever since. Mother, meanwhile, became romantically involved with a man named Raymond R. The record does not clearly provide the exact date or year in which Mother began seeing Raymond R., but the trial court observed in 2022 that they had been together for the past "nine years or more." Mother and Raymond R. had four other children together. Mother has lost and

---

[2] The number of days assigned to the parents in the plan exceed a standard 365-day calendar year. This apparent double counting of days is most likely due to the fact that plan granted Mother several hours of visitation on the days contemplated by the plan, understanding the Children would still stay with Father for the remainder of those days.

regained custody of these four children. Mother explained at trial that she had been the victim of domestic abuse at the hands of Raymond R. for many years. In 2018, Raymond R. pled guilty to numerous counts of aggravated assault involving firearms and began serving a prison sentence. While the record suggests that Raymond R. was set to be released shortly after trial, Mother testified that she had no intention of reuniting with him. She did concede, however, that she would allow him to visit and see his four children in the future provided he received adequate counseling.

Mother engaged in visitation under the plan between 2010 and early 2012, but she concedes that she has not physically visited the Children since March 4, 2012. Mother contends that Father and Stepmother took several deliberate steps to thwart her visitation. First, Mother asserts that Stepmother moved her supervised daytime visits away from the agreed-upon public locations to Father and Stepmother's residence, violating the terms of the parenting plan. Stepmother admits this occurred, countering that a change of location was necessary because Mother would not feed the Children any meals or snacks during her daytime visits, leaving the Children unfed for the duration of the visit. Mother testified that Stepmother's unilateral decision to change the location of her daytime visits made Mother incredibly uncomfortable and strained her attempts to continue visitation. Second, and relatedly, Stepmother increased Mother's discomfort further by allegedly "ha[ving] her arrested" on the grounds of harassment. According to Mother, this arrest came after Father and Stepmother deviated from the parenting plan again by requesting additional drug screens and mental health evaluations in excess of the permanent parenting plan's basic requirements as a prerequisite to *any* future visitation rather than an obstacle merely placed in the way of overnight visitation only. Mother has claimed that she provided the court with drug screen and mental health evaluation on September 17, 2012, but these documents are not included in the technical record and no party introduced copies of them at trial. Regardless, Mother responded to these requests for additional information by repeatedly contacting Father and Stepmother asking to resume her visitation, including contacting during early morning hours and from multiple phone numbers. In at least one instance, Mother contacted Stepmother but refused to identify herself when texting from a brand-new phone number despite Stepmother repeatedly asking Mother to identify herself nearly a dozen times in the text chain. Interactions like these, Stepmother testified, created a need to serve Mother with summons on the grounds of harassment. Stepmother clarified that Mother was never imprisoned, but did receive "six months [of] probation to make sure she didn't continuously harass, and if she didn't harass afterwards that [the charges would be] dropped." Third, Father and Stepmother took the Children with them when they moved to Montana in 2012 to care for Father's extended family and failed to inform Mother when they returned. Mother claims that the couple did not provide her with any notice of this cross-country relocation, alleging instead that the first notice she received came years later in the form of a termination petition that Father and Stepmother filed in Montana state court, which was apparently denied.[3] Father and Stepmother disagree, testifying that they

---

[3] The record does not clearly indicate when Mother received notice of the Montana termination

- 3 -

sent their new Montana address and updated contact information to Mother's last known address prior to leaving Tennessee. Mother's ability to communicate with the Children was greatly affected by the move, though Father and Stepmother did follow the guardian ad litem's recommendation to setup Facebook communication privileges for Mother and the Children. According to the guardian ad litem, Mother did not take advantage of this communication method. Mother also sent almost no cards or other physical correspondence to the Children, even after they returned to Tennessee in 2017.

Meanwhile, Mother lived in a home owned by the Clarksville Housing Authority from 2013 to 2016. The record is less clear about Mother's location after 2016. She indicated that she has struggled to find housing and was temporarily homeless. She testified at trial that she moved to Paducah, Kentucky, in 2020, staying sometimes with Raymond R. and other times with friends. However, she also indicated that she still considered herself homeless between 2020 and 2021.[4] Mother explained that she currently benefits from state housing assistance and insists that she has a safe home for the Children. Mother's past employment status is murky. She explained at trial that she held two positions at some point in the past ten years, working as a food delivery driver at one point and at Max Fuel at another time. Mother stated that she ceased working due to ongoing medical complications resulting from one of her prior pregnancies and that she qualified for disability benefits in 2020.

After returning from Montana, Father and Stepmother attempted to terminate Mother's parental rights in Tennessee. Although not included in the technical record, the trial court observed that it denied "[a] previous attempt to terminate Mother's rights . . . on October 25, 2019." Mother asserts that this petition was denied because she did not learn of Father and Stepmother's return to Clarksville until she saw Father randomly "at a Best Buy" one afternoon. Thereafter, Father and Stepmother filed the present petition on March 10, 2020, which was the subject of a prior appeal to this court. *In re Chance B. et al.*, No. M2020-01555-COA-R3-PT, 2021 WL 3076951 (Tenn. Ct. App. July 1, 2021). In this petition, Father and Stepmother alleged that the trial court should terminate Mother's parental rights pursuant to three grounds: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability or willingness to assume custody. After conducting a hearing in September 2020, the trial court entered an order terminating

petition, and her recollection at trial was that she received a copy of the document sometime between 2014 and 2016. Regardless, although context makes clear that Father and Stepmother's attempt to terminate Mother's parental rights in Montana was unsuccessful, no documents are included in the record from the proceedings that took place in Montana that might shed light on some of the missing details in the record. Accordingly, this court has had to rely on fleeting trial testimony and the guardian ad litem's reports regarding the prior litigation.

[4] In a prior appeal in this case, we reiterated the trial court's finding that Mother was indigent at the time of the first trial in 2020. *In re Chance B. et al.*, No. M2020-01555-COA-R3-PT, 2021 WL 3076951, at *1 (Tenn. Ct. App. July 1, 2021).

Mother's parental rights to the Children based on two of these grounds: abandonment by failure to visit and abandonment by failure to support. *Id.* This court vacated the trial court's September 2020 order in Mother's first appeal, concluding that the record was "insufficient to . . . conduct a meaningful review of the statutory grounds for termination and the best interest analysis," and remanded the case with instructions to "develop a sufficiently complete record" for review or to conduct a new trial. *Id.* at *4. After this court remanded the case, the parties agreed to hold a retrial at the end of 2022.

Multiple witnesses testified at the 2022 hearing, including Mother, Stepmother, and both of the Children. Mother objected to Father and Stepmother's reluctance to permit any form of visitation without additional drug screen results and evaluations. She argued that the permanent parenting plan only required her to provide proof of those at one time and only as a prerequisite to overnight visitation as opposed to a requirement that she continuously take drug screens as a precondition for all visitation. Mother conceded during cross examination that she did not have copies of the documents she claimed that she submitted to the court in 2012 that might prove she ever completed even one drug screen or mental health evaluation. Significantly, Mother also conceded that she lacked the ability to assume custody of the Children. Stepmother indicated that the trial court denied the first petition because Mother adequately established a lack of notice about the couple's return to Tennessee and because Stepmother told Mother she could not visit the Children whatsoever without the drug screens mentioned in the plan. Chance B. testified that he wished to be adopted by Stepmother, felt unsafe around Mother, and was negatively affected by Mother's lack of communication, and Isaiah B. provided substantially similar testimony.

The trial court terminated Mother's parental rights to the Children and granted Stepmother's stepparent adoption request on February 3, 2023. The trial court found that Mother did not adhere to the requirements of the permanency plan regarding visitation. Concerning both abandonment grounds, the trial court examined Mother's conduct between November 10, 2019, and March 10, 2020, and concluded that Father and Stepmother provided clear and convincing evidence establishing each ground. Specifically, the trial court noted that Mother could not dispute that she did not visit the Children once during the relevant four-month time period and Mother had provided no financial support. Concerning Mother's allegations of interference regarding visitation, the trial court only examined text messages between Stepmother and Mother in 2020 and determined that "[t]he limited text messages do not indicate that [Father and Stepmother] thwarted Mother's visitation." Despite stating, "Mother had years, multiple opportunities whereby Mother could have asserted herself," the trial court did not address the prior circumstances that Mother asserted constituted interference with her ability to visit.

Regarding failure to manifest an ability and willingness to assume custody, the trial court emphasized Mother's concession that she lacked the ability to assume custody. Furthermore, the trial court concluded that Mother's living circumstances reflected

- 5 -

continuing instability regarding housing and support for the Children. Addressing the risk of substantial harm element included in this ground, the trial court expressed serious safety concerns related to the Children's potential future interactions with Raymond R. Though Mother said that she would not allow Raymond R. back into her life in a manner endangering to the Children, the trial court apparently did not believe that testimony. The Court also reasoned that reuniting the Children with Mother would lead to psychological harm because the Children do not appear to have any functioning relationship with Mother, and factored that conclusion into this ground as well. Finally, the trial court examined the best interest factors outlined in the current version of Tennessee Code Annotated section 36-1-113(i)(1), rather than the version existent when the petition to terminate and for stepparent adoption was filed, concluding that termination was in the Children's best interest.

Mother appeals the trial court's decision, seeking to invalidate the termination of her parental rights and adoption of the Children by Stepmother. She raises two issues on appeal. One, Mother argues the trial court erred in determining that termination was in the best interest of the Children. While challenging the best interest analysis, Mother does not challenge the trial court's decision as to any of the three grounds for termination. Two, with regard to Chance B., Mother contends the case on appeal is moot. Mother notes that Chance B. turned eighteen in the midst of appellate briefing in this case. Mother presumes that mootness on appeal results in invalidation of the trial court's decision terminating her parental rights and granting adoption to Stepmother.[5]

## II.

We turn first to the mootness issue in this case,[6] which presents a challenging matter for consideration. This is not the first case to raise a similar issue in the context of parental termination appeals in state courts, in general, or in Tennessee courts, in particular. While such cases are relatively rare, something that is even more unusual about this case is that mootness is being raised by the party who is appealing the adverse decision of the trial court. More conventionally in similar cases, mootness is asserted as a shield by state agencies in seeking to have an appeal of a trial court's termination of parental rights dismissed, rather than as a sword by a parent seeking to overturn the decision of the trial court terminating his or her parental rights. There is something odd about a party asserting the mootness of her own appeal. After all, in advancing her assertion of mootness, Mother asks for "[t]his appeal to be dismissed as moot." As for how dismissal of her appeal as

---

[5] We note that Chance B. testified at trial in support of termination of Mother's parental rights and being adopted by Stepmother. Chance B. has not as an adult sought to intervene in this appeal.

[6] The Tennessee Supreme Court has stated that lower courts "must first consider questions pertaining to justiciability before proceeding to the merits of any remaining claims," calling it a "threshold inquiry." *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) (citing *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 119 (Tenn. 2007)).

moot will be of assistance to Mother's ultimate position on appeal, she seems to assume, without developing her argument in support of this position, that dismissal of her appeal on this basis will automatically result in a vacating the trial court's order terminating her parental rights and granting stepparent adoption. Mother makes this assumption despite the trial court undisputedly having had subject matter jurisdiction over a non-moot case at the time its order terminating Mother's parental rights and granting stepparent adoption was issued.

Contrary to Mother's contention that her appeal is moot, multiple states courts have concluded that appeals are not moot where parental rights are terminated as to a child who was a minor when the trial court issued an order terminating parental rights but who reached the age of majority while the case was on appeal. While there has been variance in the analysis, the predominant explanation for finding such cases not to be moot appears to be tied to the longstanding and widely embraced exception to mootness for continuing collateral consequences. For example, the Kentucky Court of Appeals observed that "D.M.H. has turned eighteen during the course of these proceedings, rendering this appeal moot as far as custody and control of D.M.H. Nevertheless, because termination of parental rights may result in collateral consequences, we will consider this case on its merits." *K.R.K. v. Cabinet for Health & Family Servs.*, No. 2019-CA-001189-ME, 2020 WL 1898881, at *1 n.2 (Ky. Ct. App. Apr. 17, 2020). Similarly, the New Jersey Superior Court Appellate Division concluded that "[a]lthough P.G. has since turned eighteen, because of the legal consequences to G.M. of the termination of her parental rights, we choose not to dismiss this appeal as moot." *N.J. Div. of Youth & Family Servs. v. G.M.*, No. A-3989-11T3, 2013 WL 4052671, at *1 n.3 (N.J. Super. Ct. App. Div. Aug. 13, 2013). The Superior Court of Pennsylvania also found an appeal in a case involving termination of parental rights to not be moot because of the continuing detriment to a party as a result of the decision. *In re J.R.S.*, 281 A.3d 1097, 2022 WL 2348197, at *4 n.5 (Pa. Super. Ct. 2022). The Texas Court of Appeals drew a particularly insightful distinction between a conservatorship that had been granted to a state agency for a minor that ended at age 18, which was found to be moot on appeal, and the actual termination of parental rights as to the same minor, which the court found not to be moot. *In Interest of J.N.A.*, No. 04-14-00825-CV, 2015 WL 1393272, at *1 (Tex. App. Mar. 25, 2015) (noting the "effects of [the] termination order" in concluding that "J.N.A. turned eighteen years old in February 2015; the question of J.N.A.'s conservatorship is moot but the termination of M.O.'s parental rights to J.N.A. is not"). Nor are these the only state courts' decisions reaching this result. *See, e.g.*, *In re Levins*, No. 357555, 2022 WL 2286195, at *1 n.1 (Mich. Ct. App. June 23, 2022) (concluding that the appeal was not moot and citing *In re Smith*, 919 N.W.2d 427, 434 (Mich. Ct. App. 2018) ("[W]e agree that this case is not moot because the trial court's termination of respondent's parental rights may have collateral legal consequences for respondent.")); *In re Welfare of the Children of A.M.S.*, No. A09-1276, 2009 WL 4251155, at *2 (Minn. Ct. App. Dec. 1, 2009) (concluding that a decision was of continuing effect and thus not moot).

Panels of the Tennessee Court of Appeals have reached conflicting decisions in a number of unpublished cases regarding the issue of mootness where a child as to whom parental rights were terminated reached the age of majority after the trial court issued its order terminating parental rights but while the case was pending on appeal. For example, this court in *In re Christabell B.*,[7] *In re Samone D.*,[8] and *In re C.N.*[9] concluded that the appeal was moot under such circumstances. However, in *In re Jeremy C.*,[10] this court concluded that the appeal was not mooted by the individual turning eighteen during the pendency of appeal.[11] This court has not addressed in these decisions whether or how collateral consequences impact the question of whether an appeal is moot in such cases.[12]

Turning to the doctrine itself, mootness is among the justiciability doctrines that "provide criteria for determining whether the courts should hear and decide a particular case." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196,

---

[7] *In re Christabell B.*, No. M2021-01274-COA-R3-PT, 2023 WL 8112559, at *1 n.2 (Tenn. Ct. App. Nov. 22, 2023).

[8] *In re Samone D.*, No. W2021-01225-COA-R3-PT, 2023 WL 1962016, at *1 n.2 (Tenn. Ct. App. Feb. 13, 2023).

[9] *In re C.N.*, No. M2020-01021-COA-R3-PT, 2022 WL 94403, at *1 n.2 (Tenn. Ct. App. Jan. 10, 2022).

[10] *In re Jeremy C.*, No. M2020-00803-COA-R3-PT, 2021 WL 754604, at *6 n.5 (Tenn. Ct. App. Feb. 26, 2021).

[11] This matter has also arisen in cases involving significantly different circumstances such as where the child turned eighteen before the trial court decided upon a petition to terminate parental rights. *See*, *e.g.*, *In re Jeffery B.*, No. W2012-00924-COA-R3-PT, 2012 WL 4854719, at *1 & n.2 (Tenn. Ct. App. Oct. 12, 2012).

[12] There are numerous consequences stemming from a termination of a parent-child relationship with regard to legal rights and responsibilities. *See*, *e.g.*, 20 U.S.C. § 1090 (addressing familial information that is to be provided in connection with obtaining post-secondary financial aid); 42 U.S.C. § 300gg-14 (providing for eligibility of adult child to remain under parent's health insurance until age 26); Tenn. Code Ann. § 31-2-101 et. seq. (addressing intestate succession rights); Tenn. Code Ann. § 20-5-106(a) (identifying wrongful death beneficiaries); Tenn. Code Ann. § 63-2-101(b)(3) (addressing medical decision-making authority where a person becomes incapacitated); Tenn. Code Ann. § 36-2-311 (establishing retroactive child support awards); Tenn. Code Ann. § 36-5-101(k) (providing for continuing support obligations as to a child past the age of majority with special needs); Tenn. Code Ann. § 34-1-102(b) (addressing continuing support obligations as to an eighteen-year-old who remains in high school); *Farmer v. Farmer*, 562 S.W.2d 205 (Tenn. 1978) (addressing death benefits of adult children in the workers' compensation context). There are also a variety of important private sector impacts stemming from a change in parent-child relationship status including, for example, payable on death benefits and hospital visitation policies.

202 (Tenn. 2009).[13]   Delineating the broad contours of the mootness doctrine, the Tennessee Supreme has observed that

> A case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition.   While the doctrines of standing and ripeness focus on the suit's birth, the doctrine of mootness focuses attention on the suit's death.   A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case.   A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party.

*Id*. at 203-04 (citations omitted).   The mootness doctrine is not to be applied mechanically in Tennessee.   *Id*. at 204.   Even where mootness would, otherwise, seemingly prevent further adjudication,

> [o]ver time, the courts have recognized several circumstances that provide a basis for not invoking the mootness doctrine.   These circumstances include: (1) when the issue is of great public importance or affects the administration of justice, (2) when the challenged conduct is capable of repetition and of such short duration that it will evade judicial review, (3) when the primary subject of the dispute has become moot but collateral consequences to one of the parties remain, and (4) when the defendant voluntarily stops engaging in

---

[13] The Tennessee Supreme Court, addressing justiciability, has explained that

The Constitution of Tennessee does not expressly define the powers of the Legislative, Executive, or Judicial Branches of government. *Richardson v. Young*, 122 Tenn. 471, 493, 125 S.W. 664, 668 (1909).   Thus, while Article III, Section 2 of the United States Constitution confines the jurisdiction of the federal courts to "cases" and "controversies," the Constitution of Tennessee contains no such direct, express limitation on Tennessee's courts' exercise of their judicial power.   U.S. Const. art. III, § 2; Tenn. Const. art. I, §§ 1-2; *Miller v. Miller*, 149 Tenn. 463, 484, 261 S.W. 965, 971 (1924) (noting that the Constitution of Tennessee does not contain limitations similar to those in Article III, Section 2).

Despite the absence of express constitutional limitations on the exercise of their judicial power, Tennessee's courts have, since the earliest days of statehood, recognized and followed self-imposed rules to promote judicial restraint and to provide criteria for determining whether the courts should hear and decide a particular case.   These rules, commonly referred to as justiciability doctrines, are based on the judiciary's understanding of the intrinsic role of judicial power, as well as its respect for the separation of powers doctrine in Article II, Sections 1 and 2 of the Constitution of Tennessee.

*Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 202-03.

the challenged conduct.

*Id*. (footnotes omitted).[14]

Though related, the circumstances of the present case diverge in one important respect from those of the previously referenced Tennessee cases that addressed mootness in the context of the termination of parental rights as to a child who subsequently turned eighteen during an appeal. The termination of parental rights in the present case is intertwined with a stepparent adoption. None of the above-referenced Tennessee cases involved such a circumstance. Given the changing status of the legal relationships between Chance B. and Mother and Chance B. and Stepmother, respectively, and their entwinement with the termination of Mother's parental rights, we cannot say that this is a case in which there is no judicial relief available for the prevailing party. This very much remains a live legal controversy rather than one that has died. While this case bears a striking resemblance to the above reference Tennessee cases, the conjoined stepparent adoption with termination shows this case remains breathing. Accordingly, we conclude that this appeal is not moot.

III.

Turning to the merits of the appeal, parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483

---

[14] "[T]he Tennessee Supreme Court has, more than once, interpreted the Tennessee Constitution in a manner that varies from the federal courts' interpretation of justiciability doctrines under Article III of the United States Constitution." *Rutan-Ram v. Tenn. Dep't of Children's Servs.*, No. M2022-00998-COA-R3-CV, 2023 WL 5441029, at *6 n.6 (Tenn. Ct. App. Aug. 24, 2023). The public interest exception to mootness is one such example. *Id*. (citing *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 208-12.)

S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

IV.

The trial court found clear and convincing evidence established three grounds for termination: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody. On appeal, Mother does not contest the trial court's determination that the record reflects clear and convincing evidence to support each of the grounds found by the trial court. Nevertheless, it is incumbent upon this court to address each ground for termination pursuant to the Tennessee Supreme Court's directive to this court to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26.

A. Abandonment by Failure to Visit

The trial court found that clear and convincing evidence established that Mother abandoned the Children by failure to visit. *See* Tenn. Code Ann. § 36-1-113(g)(1). Abandonment occurs when a parent fails to visit his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective March 6, 2020, to June 30, 2021).[15] "The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). Tennessee Rule of Civil Procedure 15.02 allows the court to address an affirmative defense not raised in an answer if the parties tried the defense by express or implied consent. *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *10 n.9 (Tenn. Ct. App. Dec. 4, 2023) (collecting cases). "Implied consent hinges on the issues that were actually litigated by the parties. . . ." *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997); *see also In re Glenn B.*, 2023 WL 8369209, at *10 n.9. That is, "[i]mplied consent arises from the parties and trial court understanding something to be at issue and actually litigating it." *In*

_____

[15] *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023), *perm. app. denied* (Tenn. Apr. 4, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

- 11 -

*re Glenn B.*, 2023 WL 8369209, at \*10 n.9 (citing *Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 236 (Tenn. Ct. App. 2019)).  Where the absence of willfulness is properly before the trial court as an affirmative defense, this defense "must be established by a preponderance of the evidence" and the evidence need not rise to the level of being clear and convincing.  Tenn. Code Ann. § 36-1-102(1)(I).

Mother does not dispute that she has not visited the Children in over ten years, exceeding the statutory requirement to show a failure to visit the Children between November 2019 and March 2020, the relevant four-month time at issue based upon the timing of the filing of the petition to terminate and for stepparent adoption, by a significant margin.  However, Mother consistently argued that all of her efforts to visit the Children were thwarted by Father and Stepmother's interference. Father and Stepmother testified in opposition to Mother's contention.  This willfulness-related testimony as to visitation stood as a central focus of trial testimony, especially from Mother.  The trial court addressed Mother's interference argument in its final order, albeit in a limited fashion.  From review of the record and the trial court's order, we conclude willfulness was tried by implied consent.

The Tennessee Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child."  *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)); *see also In re M.L.P.*, 281 S.W.3d 387, 392-93 (Tenn. 2009) ("Thus, a parent's failure to visit is willful when it is 'the product of free will, rather than coercion.'" (quoting *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005))).  "A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempt to visit the child."  *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*5 (Tenn. Ct. App. July 22, 2020) (quoting *In re M.L.P.*, 281 S.W.3d at 393); *In re Mattie L.*, 618 S.W.3d 335, 350-51 (Tenn. 2021) ("Failure to visit is not willful if it is the result of coercion").

Interference analysis "is not a mechanical process."  *In re Braelyn S.*, 2020 WL 4200088, at \*5.  This court has previously held that numerous activities can constitute interference in the failure to visit context, including blocking a biological parent from accessing their child, concealing a child's whereabouts from the biological parent, and "vigorously resisting" a biological parent's visitation efforts.  *Id.* (quoting *In re S.M*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004)).  We have also said that interference may exist when there exists such "enmity between the parties" that the parties "redirect their efforts at maintaining a parent-child relationship to the courts."  *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).  Because interference often occurs prior to the four-month period examined within the failure to visit ground, "courts often consider events that occurred prior to the relevant period [outlined by the termination statute] to determine if

there was interference with the biological parent's attempts to visit." *In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at \*6 (Tenn. Ct. App. Nov. 15, 2011) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 801; *In re S.M.*, 149 S.W.3d 632 (Tenn. Ct. App. 2004)); *In re Braelyn S.*, 2020 WL 4200088, at \*5.

The trial court, however, limited its interference analysis to actions occurring during the four-month period for abandonment and did not consider the totality of the parties' interactions concerning the Children. The trial court emphasized that few text messages were introduced at trial showcasing Mother's efforts to visit the Children during the four-month period and that "the limited text messages do not indicate that [Father and Stepmother] thwarted Mother's visitation." In light of the circumstances and arguments advanced in this case, we conclude that the trial court's decision to limit its interference inquiry to the four-month period outlined in the termination statute for the abandonment grounds was in error. The trial court heard testimony that prior to the four-month period Father and Stepmother relocated visitation in contravention of the permanent parenting plan, initiated criminal proceedings against Mother in response to her attempts to contact Father and Stepmother, moved the Children to Montana for over five years, and neglected to notify Mother of their return to Tennessee. There is, however, conflicting testimony that also suggests that Mother may have made little effort to visit the Children even in the absence of interference by Father and Stepmother. Significantly, the trial court did not make a finding as to whether these actions interfered with Mother's visitation. Instead, the trial court's analysis seems to reflect an understanding that actions prior to the four-month period for visitation abandonment cannot be part of its consideration of willfulness rather than a factual determination that they were inconsequential to the willfulness of Mother's visitation-related actions during the relevant four-month time period under the statute.

Under the circumstances of the present case and given the nature of the arguments advanced by Mother in support of her lack of willfulness defense and in opposition thereto by Father and Stepmother, the trial court's findings were incomplete in important respects with regard to the issue of willfulness regarding visitation in the present case. The trial court's conclusion that a lack of willfulness was not established was not necessarily in error but its analysis on this point was incomplete in a manner that leaves this court in a position of making critical factual determinations upon disputed grounds to reach a conclusion as to willfulness with regard to failure to visit. Accordingly, we vacate, rather than reverse, the trial court's order insofar as the trial court found that Mother failed to show a lack of willfulness with regard to her failure to visit. However, because we ultimately affirm the trial court's judgment upon other grounds for reasons discussed below, there is no purpose served by the trial court further addressing the issue of whether Mother's failure to visit was willful on remand.

## B. Abandonment by Failure to Support

The trial court also found that clear and convincing evidence established that Mother

abandoned the Children by failure to support. *See* Tenn. Code Ann. § 36-1-113(g)(1). Failure to support occurs when a parent fails to support his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Failure to support is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). Support must be more than just token support, which is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102 (1)(B). As in the context of failure to visit, a lack of willfulness also exists as an affirmative defense to failure to support but only when a party properly invokes it. Tenn. Code Ann. § 36-1-102(1)(I).

Mother does not dispute that she failed to send the Children any support for a period of time long exceeding the four-month timeframe contemplated by the termination statute. In fact, the evidence presented established a lack of support from Mother for more than a decade. Unlike the failure to visit ground, Mother did not argue a lack of willfulness concerning this ground at trial. Accordingly, Father and Stepmother did not respond to an affirmative defense that was never raised. Where an affirmative defense has not been pled, that failure to plead generally results in waiver of the affirmative defense. *In re Glenn B.*, 2023 WL 8369209, at *10 (citing *Branch Banking & Trust Co.*, 582 S.W.3d at 233). Mother does not contend that this issue was tried by consent. Nor does the record reflect that the affirmative defense of willfulness was tried by either express or implied consent. Accordingly, we find no error in the trial court's conclusion that the ground for termination of failure to support was established by clear and convincing evidence.

C. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also found clear convincing evidence that Mother failed to manifest a willingness and ability to assume custody of the Children. To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.* "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves

- 14 -

around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.* As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" but to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

As the trial court observed, Mother conceded the ability prong at trial during the following exchange:

> Q. . . . So right now you – it sounds like you agree, your current housing situation, you don't think you've got a – maybe that your housing's okay, but you don't have a financial ability to maintain custody of these two kids, right?
>
> A. Yes. . . .

Beyond this concession, additional evidence was presented indicating a lack of ability to assume custody. In the trial court's order, it observed that "[b]y Mother's own testimony she has not had an ability to assume physical custody or financial responsibility for the children during the relevant time frame, even up through the date of the hearing." The evidence presented supports the trial court's conclusion that Mother lacked the ability to assume custody of the Children.

Furthermore, regarding the substantial risk of harm prong, the trial court expressed significant concern about reuniting the Children with Mother given her relationship with Raymond R. Mother indicated at trial that, while she may not currently feel comfortable seeing him, Raymond R. might come into contact with the Children if they were returned to Mother's custody. The trial court stated that "In terms of this Court's willingness to believe Mother's testimony that the gentleman is not coming back the Court does not have faith that this is really the case." Given its credibility finding, we find no fault in the trial court's concern for the safety of the Children given Raymond R.'s violent

behavior. Additionally, the trial court expressed concern about the psychological harm stemming from reuniting the Children with Mother, who had been absent from the Children's lives for more than a decade and with whom the Children do not have a meaningful relationship. The evidence presented supports the trial court's concerns regarding a substantial risk of harm to the Children. Accordingly, we cannot conclude that the trial court erred by determining that clear and convincing evidence supported the ground of failure to manifest an ability or willingness to assume custody.

V.

If at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

Father and Stepmother filed the termination petition on March 10, 2020. At this time, Tennessee's termination of parental rights statute directed courts to consider nine nonexclusive factors when determining whether termination is in a child's best interests.

- 16 -

Tenn. Code Ann. § 36-1-113(i) (effective March 6, 2020, to April 21, 2021).  Subsequently, the Tennessee General Assembly amended section 113(i), expanding the list of best interest factors from nine to twenty.  *See* 2021 Tenn. Pub. Acts ch. 190 § 1 (effective April 22, 2021).  Though the parties and the court proceeded forward in this matter addressing the more extensive twenty factors list, our past cases have emphasized that "the amended statute only applies to petitions for termination filed on or after April 22, 2021."  *In re Alessa H.*, No. M2021-01403-COA-R3-PT, 2022 WL 3332653, at *12 (Tenn. Ct. App. Aug. 12, 2022) (quoting *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *13 n.10 (Tenn. Ct. App. Jan. 14, 2022), *perm. app. denied* (Tenn. Mar. 17, 2022)), *no perm. app. filed*.  Consequently, the trial court should have considered the list of nine factors, not the expanded list of twenty factors.

Under Tennessee Code Annotated section 36-1-113(i), in determining the best interest of the child, the trial court, however, is "not limited to" consideration of the listed factors.  Tenn. Code Ann. § 36-1-113(i) (effective March 6, 2020 to April 21, 2021).  This court has noted that because the prior version of the statute treated the nine factors as "non-exclusive," a court may consider additional arguments made in the context of a best interest analysis.  *In re Audrey S.*, 182 S.W.3d at 878; *see also In re Riley S.*, 2022 WL 128482, at *13 n.10.  "A trial court's application of the previous factors together with the new factors is not error if the factors considered are relevant to the facts presented by the case."  *In re Nation F.*, No. W2023-00510-COA-R3-PT, 2024 WL 277960, at *6 (Tenn. Ct. App. Jan. 25, 2024) (citing *In re Mitchell B.*, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at *6 (Tenn. Ct. App. May 24, 2023), *no perm. app. filed*).  Even when analysis is not structured in this manner, the trial court's decision to use the list of twenty factors instead of the list of nine factors is not, by itself, reversible error.  *See In re Clara A.*, No. E2022-00552-COA-R3-PT, 2023 WL 1433624, at *8 (Tenn. Ct. App. Feb. 1, 2023) ("[T]his Court has held that a trial court's reliance on the newer factors is not generally reversible error 'because the old factors are essentially contained within the new factors.'" (quoting *In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022), *perm. app. denied* (Tenn. Aug.12, 2022))), *no perm. app. filed*.  "Because the statutory factors are not exclusive, regardless of which version of the statute is applicable, if the trial court's findings are sufficient to allow us to 'make a meaningful review' of its best-interest determination, then remand is unnecessary."  *In re Nation F.*, 2024 WL 277960, at *6) (citing *In re Mitchell B.*, 2023 WL 3619561, at *6).  In the present case, the trial court's findings are sufficiently detailed to allow this court to consider the nine statutorily identified factors and to consider the other factors as additional considerations by the trial court in assessing the Children's best interest.

The list of nonexclusive factors that apply to Father and Stepmother's termination petition are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best

interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (effective March 6, 2020, to April 21, 2021).

The first factor considers whether the parent's circumstances have remained substantially the same or if the parent has overcome obstacles standing in the way of successful custody. Here, the trial court concluded that Mother has not improved her own circumstances. Notably, the trial court was unpersuaded that Mother would act appropriately to keep the Children from being exposed to the danger posed by Raymond R. Additionally, the trial court expressed doubt that Mother understands "how to be a Mother or what a Mother should do or what those needs are to be provided from a mother

- 18 -

to a child. The Court thinks that if Mother understands, she hasn't developed that connection with these children since her divorce." The record supports the trial court's conclusion that this factor weighs in favor of terminating Mother's parental rights.

The second factor turns on a parent's response to the reasonable efforts of a social services agency, such as the Department of Children's Services. However, DCS has not been involved in this case. Accordingly, the second factor is inapplicable in the present case.

The third factor deals with the parent's visitation and contact. The trial court concluded that Mother has not visited the Children in over ten years and has, essentially, had no contact with the Children. With regard to communication, the trial court found that "Mother's efforts have been lackluster in terms of her attempts to communicate with the children." The evidence supports the trial court's conclusion that this factor favors termination.

The fourth and fifth factors both concern the Children's relationships with the parties in this case. The fourth factor turns on the Children's relationship with Mother, which both testified is non-existent. Chance B. suggested that even hearing from Mother in the form of one birthday card angered him. The fifth factor turns on the Children's relationship with Father and Stepmother, specifically whether or not separating the Children from the couple would negatively impact the Children. The Children's testimony in this regard is compelling. Both Chance B. and Isaiah B. testified that they are attached to Father and Stepmother and indicated that they desire to have Stepmother's adoption proceed forward. The trial court found the bond between Stepmother and the Children is strong while the bond with Mother is non-existent. The Children also suggested at trial that they would feel unsafe reuniting with Mother. The trial court also concluded that reuniting Mother with the Children in the absence of a well-established relationship and extended absence from their lives would cause psychological harm. Accordingly, the evidence supports the trial court's conclusion that the fourth and fifth factors favor termination.

The sixth, seventh, and eighth factors address through various angles the environment that the Children would re-enter if reunited with Mother. There is no proof in the record that Raymond R. ever interacted with Chance B. and Isiah B. Mother was, however, the victim of domestic abuse at the hands of Raymond R. The trial court did not believe Mother's testimony that she would not allow Raymond R. back into her life in a manner that could pose a danger. To the contrary, the trial court concluded that Raymond R.'s incarceration, which was soon coming to end, was the only thing keeping him out of Mother's life. The trial court also noted Mother's own testimony about her inability to adequately provide for the Children and housing instability. As for Mother's mental or emotional state, the trial court concluded that there was insufficient evidence on this matter to support termination on that basis. The record supports the trial court's conclusion that

factors six and seven support termination while factor eight does not.

Finally, the ninth factor relates to Mother's financial support of the Children. As acknowledged in the failure to support ground analysis, Mother has not provided any form of financial support to the Children in more than a decade. The trial court concluded that this factor supports termination, and the record supports this conclusion.

Reflecting upon the more extensive list of factors adopted with subsequent amendment by the General Assembly, the trial court found a number of these additional factors supported termination of parental rights. Many of these factors are closely related to the analysis as to the nine factors addressed above. The trial court noted the importance of stability and continuity with the Children's existing relationship with Father and Stepmother and the harm to that from Mother reentering their lives after having been absent for over a decade. The trial court also concluded that Mother had demonstrated instability and lack of continuity in her life and had not demonstrated that she could provide the continuity and stability that the Children would need for their safety and wellbeing. In seeking custody and addressing the circumstances inhibiting her custody of the Children, the trial court concluded that "Mother has had eleven (11) years to come forward and has shown no urgency," as a factor supporting termination. In terms of providing safe and stable care for Chance B. and Isiah B. or any other children, the trial court determined that "Mother hasn't provided care for these children in a long time. Mother has many other children, and hasn't provided safe and stable care for her other children, even when she didn't have the children who are the subject of this action." Regarding knowledge and understanding of the Children's needs, the trial court was not persuaded that Mother had such knowledge and concluded that "she hasn't developed that" with regard to the Children. We find no fault in the trial court's consideration of these factors as relevant to the best interest analysis, and the record supports the trial court's findings as to these factors.

The trial court ultimately concluded that termination was in the Children's best interest by clear and convincing evidence. "While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that the [Children's lives] will not be improved by a reintroduction to Mother." *In re Chayson D.*, 2023 WL 3451538, at *15 (citation omitted). The best interest analysis turns on what outcome would be best for the Children in this situation. We find no error with the trial court's conclusion that the best interest of the Children supports termination. Clear and convincing evidence supports the trial court's conclusion.

VI.

Accordingly, having concluded that this appeal is not moot as to Chance B., we affirm the trial court's decision to terminate Mother's parental rights and award stepparent

adoption to Stepmother.  Therefore, we affirm judgment of the trial court.  The costs of the appeal are taxed to the appellant, Heather B., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.


_____
JEFFREY USMAN, JUDGE